255 So.2d 912 (1971)
HOOD INDUSTRIES, INC.
v.
H.A. KING and Robert Wales Kiser, Executor of the Estate of L.S. Kiser, Deceased.
No. 46417.
Supreme Court of Mississippi.
December 13, 1971.
Carter, Mitchell & Robinson, Jackson, for appellant.
Tubb & Stevens, West Point, John P. Fox, Houston, for appellees.
GILLESPIE, Chief Justice:
Suit was filed in the Chancery Court of Noxubee County, Mississippi, by H.W. *913 King and Robert W. Kiser, executor of the estate of L.S. Kiser, deceased, against Hood Industries, Inc., (Hood) to recover royalties on clay used in the manufacture of brick. From a decree in favor of the complainants, this appeal was taken. We affirm.
On November 19, 1955, H.A. King and L.S. Kiser entered into a written memorandum agreement with Paul L. James and Herbert Dickson. This memorandum recited that King and Kiser had located certain strata of clay deposits in Kemper and Noxubee Counties; that James and Dickson were interested in purchasing and manufacturing said clay; and that in consideration for showing said clay deposits to James and Dickson, and in the event James and Dickson desired to lease said clay for the purpose of manufacturing the same, King and Kiser would have the exclusive right to handle the leasing of clay in order that they might make a profit out of it. King and Kiser agreed that if they located any additional clay in said area they would give James and Dickson the refusal of purchasing it.
On December 14, 1955, James and Dickson organized a corporation by the name of Superior Clay and Products Corporation (Superior), and on February 26, 1956, the contract upon which this suit is based was entered into between King and Kiser and Superior. The essential provisions of this contract are as follows.
Paragraph 1 recites that King and Kiser are familiar with the topography and geological aspects of the land areas in Kemper and Noxubee Counties, and all counties contiguous thereto from years of prospecting and exploration. King and Kiser agreed with Superior to engage in the leasing of lands in said counties for the mining of clay, and to assign such leases as they already had to Superior and obtain future leases in the name of Superior.
Paragraph 2 provides as follows:
The party of the second part (Superior) covenants and agrees that it, or its assigns or successors, shall not engage in leasing of such lands for said purposes in the aforementioned counties in competition with the parties of the first part (King and Kiser); however, it is distinctly understood and agreed that in the event the parties of the first part shall be unable, for any reason, to lease any lands which the officers and directors of Superior Clay & Products Corporation find desirable and necessary for its corporate purpose, and which it may lease by direct negotiation with the lessor or his agent, then it shall have the right so to lease, but in such event parties of first part will receive royalty from same at the same per cent as other lands.
Paragraph 3 provides that all leases obtained for Superior shall be assigned to King and Kiser in the event Superior shall determine said leases are unnecessary or of unsuitable nature for its purposes. Superior agreed that neither it nor its officers or employees would disclose to any person any confidential information regarding the location or nature of clay deposits prior to leasing by King and Kiser.
Paragraph 4 provides that Superior agreed to diligently mine all clay deposits so leased insofar as practicable with the market conditions available to it, and such leases, if assigned, shall be made subject to the compensatory provisions hereinafter specified.
Paragraph 5 provides as follows:
[Superior] contracts and agrees that the parties of the first part (King and Kiser) shall be compensated by it as follows: (1) payment of a royalty of fifty cents ($.50) per ton of 2000 pounds on all kolin or high grade clay suitable for chinaware, fine ceramic wall or floor tile or pottery ware, and like products, produced, processed and sold as such; (2) payment of a royalty of twenty-five ($.25) per ton of 2,000 pounds on all clays of every type used, processed or raw, sold as brick clay or its equivalent.
*914 Paragraph 6 provides that Superior shall deduct from the royalty specified in paragraph 5 the royalty due the lessor, paying the same over to the said lessor directly.
Paragraph 7 reads as follows:
This contract shall continue as long as parties of second part or their successors or assigns continue mining operations on the lands covered by this contract; and/or the life of the parties of the first part and their heirs; and in event said mining operations are discontinued for a period of as much as six (6) months, then said leases are to be assigned to parties of first part.
Pursuant to this agreement, Superior secured ten leases for the mining of clay in Noxubee County, embracing about 1100 acres of land. However, no clay was mined and no bricks were manufactured, because Superior was unable to finance the construction of a brick plant.
On December 20, 1956, Atlas Tile and Brick Company, Inc., (Atlas) was chartered by the State of Mississippi with substantially the same management as Superior. All ten tracts of land under lease to Superior were assigned to Atlas in return for the issuance by Atlas to Superior of 6500 shares of Atlas' capital stock. Atlas issued a prospectus for the sale of stock which included a letter to Atlas from a geologist. This letter stated that tests on the ten tracts of land leased by Superior and acquired by Atlas contained clay suitable for the manufacture of tile and brick and of sufficient quantity for the removal of 500,000 tons annually over a period of approximately forty years. Thereafter, Atlas Tile & Brick Company, Inc., changed its name to Atlas Brick Company, and on July 31, 1965, Atlas Brick Company merged with and into Mississippi Industries, Inc. During the pendency of this suit, the corporate name of Mississippi Industries was changed to Hood Industries, Inc.
After procuring the ten leases by assignment from Superior and the assumption of the contract between King and Kiser on the one hand and Superior on the other, Atlas proceeded with a public stock sale and raised funds for the operation of a brick manufacturing plant. Atlas secured the supervision of the plant and began production in 1960, and since that date the plant has operated continuously as a plant engaged in the manufacture of brick.
Atlas and its successors tried on several occasions to negotiate for a cancellation or revision of the contract with King and Kiser, but King and Kiser would not agree to any change. Atlas, and later Mississippi Industries, paid King and Kiser the royalties thereafter for the clay mined from the lands covered by the ten leases originally obtained by King and Kiser, until 1965, when Mississippi Industries entered into an oral agreement to mine clay from the Butler-Hubbard tract adjoining the lands embraced in the original ten leases. Mississippi Industries mined clay from the Butler-Hubbard tract until complaint was made by King and Kiser, after which they resumed mining on the lands embraced within the ten original leases. Negotiations had been going on intermittently between King and Kiser on the one hand and Mississippi Industries on the other for a considerable time with reference to the overriding royalty. Finally, Mississippi Industries again resumed mining on the Butler-Hubbard tract and declined to pay the royalty on any clay except that mined from the lands embraced within the original ten leases. This suit was then brought and after an accounting and hearing of the evidence, the court found that Mississippi Industries owed overriding royalties to King and the executor of Kiser's estate on clays procured from the Butler-Hubbard tract amounting to $7,357.90, and entered judgment accordingly.
On appeal, Hood's argument assumes that paragraph 2 of the contract is a covenant not to compete. It then proceeds to argue (a) that the noncompetitive covenant is severable and divisible from the remainder of the contract; (b) that Atlas never assumed or became bound by the severable *915 and divisible covenant not to compete; (c) that if Atlas assumed the covenant not to compete, its procuring clay from the Butler-Hubbard tract by oral agreement did not violate the covenant; and (d) that even if Atlas assumed the covenant not to compete, such covenant violates the antitrust laws of the state and is void and unenforceable. Our view of the case requires a somewhat different approach to the questions involved.
The decisive questions in this case are (1) whether the contract is essentially a noncompetitive contract in restraint of trade, (2) whether Atlas assumed the contract in its entirety, and (3) whether Hood is liable for clay mined from the Butler-Hubbard tract.

I.
Our study of the contract between King and Kiser on one hand and Superior on the other convinces us that paragraphs 2, 5 and 6, when read together, provide for King and Kiser to be paid a royalty of ten cents per ton "on all clays of every type used, processed or raw, sold as brick clay or its equivalent." This royalty was over and above the fifteen cents per ton royalty received by the lessors. Paragraph 2 provides that Superior shall not compete with King and Kiser in leasing lands for the purpose of mining clay; however, it then provides that if King and Kiser shall be unable for any reason to lease lands Superior found necessary for its corporate purposes, then Superior had the right so to lease, but in such event, King and Kiser would still receive the overriding royalty of ten cents per ton. The provision regarding competition did not have as its purpose restraint on Superior, but was directed solely toward assuring the payment of the overriding royalty. King and Kiser had made an important discovery of clay deposits. All the parties regarded the information as valuable. Superior was willing to obligate itself to pay an overriding royalty to King and Kiser in consideration of being furnished the information King and Kiser had and the latter's agreement to secure the leases for Superior. Rather than being a contract restraining Superior from engaging in leasing clay lands, the contract is, in its essence, one to pay King and Kiser an overriding royalty. It does not restrain Superior from leasing. It does provide that if Superior leases clay lands then King and Kiser shall be paid the overriding royalty as on lands leased by King and Kiser and assigned to Superior.
We conclude that rather than being a noncompetitive agreement in restraint of trade, the contract merely provides that Superior shall pay King and Kiser an overriding royalty on all clay used for its corporate purposes during the life of the contract. Cf. Yazoo & M.V.R. Co. v. Searles, 85 Miss. 520, 37 So. 939 (1905). It may be burdensome on Superior's assignees, but if so, this Court has no rightful power to relieve them from their own improvidence. 12 C.J.S., Cancellation of Instruments § 23, p. 970 (1938).
In its argument that the contract violates the antitrust laws, Hood contends the contract is permanent in duration. We are of the opinion that the contract limit as to time is forty years. The record clearly shows that the parties contemplated that the ten leases assigned to Atlas were sufficient for forty years. The leases were for a term of twenty years with the right to renew for an additional twenty years, and the letter from the geologist, made a part of the Atlas stock prospectus, estimated that the lands embraced in these leases contained a sufficient amount of clay to supply 500,000 tons annually for forty years.

II.
Superior assigned the ten leases to Atlas, and Atlas issued Superior 6500 shares of Atlas stock. Shortly prior to such assignment and on December 20, 1956, a charter had been granted to Atlas by *916 which charter Atlas, among other things, was vested with the right, power and authority to lease and own lands, to mine and procure clays, and to manufacture brick. This new corporation was created by substantially the same management as Superior, i.e., Paul L. James, H.A. Dickson and L.C. Guillot, three of the new directors of Atlas, had also been three of the five stockholders of Superior. Also, Mr. James became its secretary-treasurer. Shortly after the organization of Atlas, and on January 25, 1957, at a specially called meeting of the stockholders of Atlas, the following resolution was adopted:
The next item of business coming before the meeting was that of the proposal of Superior Clay and Products Corporation to assign its leases on clay bearing lands in Kemper and Noxubee Counties, consisting of 1,128 acres, assumption of its contract with H.A. King and L.S. Kiser on royalty override, and its title to one used Lorain Dragline, 1/2 to 5/8 yard capacity, with 30 foot boom, to Atlas Tile and Brick Company, Inc., in consideration of 6,500 shares of stock. Thereupon it was moved by H.M. Haggard, seconded by C.D. Noble, and voted unanimously that the President and Secretary-Treasurer issue the 6,500 shares of stock of this company to Superior Clay and Products Corporation for assignment of the leases, the Lorain Dragline, and assumption of the contract, the leases to be properly recorded in the respective counties.
In our opinion the intent of Atlas to assume the contract is manifestly clear in the most formal manner. 6 C.J.S., Assignments § 107, p. 1162 (1937). It is conceded that Atlas' liabilities were assumed by Hood Industries through the corporate merger already mentioned.

III.
The chancellor correctly held that Hood was liable for the overriding royalty on all clay mined from the Butler-Hubbard tract. The contract provided that royalty was to be paid on all clay used,  i.e., not only on the ten leases, but on any leases obtained by Superior within the specified geographic area. This was the price Superior was willing to pay for the information and services of King and Kiser, and its successor is bound to the same terms. Atlas' board of directors solemnly bound the corporation by assuming the contract in its entirety, specifically referring to the overriding royalty. The chancellor correctly held that Atlas could not negate the contract by entering into another type of arrangement with a landowner to mine clay.
We are of the opinion the chancellor correctly applied the contract and his decree should be and is affirmed.
Affirmed.
JONES, BRADY, PATTERSON and SMITH, JJ., concur.