# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-CT-00829-SCT

*VULCAN MATERIALS COMPANY*

*v.*

*EDWARD E. MILLER*

## ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 08/09/93 |
| TRIAL JUDGE: | HON. CHARLES D. THOMAS |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | A.M. EDWARDS, III |
| ATTORNEY FOR APPELLEE: | JAMES E. PRICE, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 1/30/97 |
| MOTION FOR REHEARING FILED: | 2/13/97 |
| MANDATE ISSUED: | 4/10/97 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Edward E. Miller brought suit in the Chancery Court of Tishomingo County against Vulcan Materials Company to enforce a royalty agreement entered into between Miller and Glen and George Lambert. The chancellor found that Vulcan was obligated to pay Miller the royalty provided in the royalty agreement and Vulcan appealed. On November 28, 1995, the Court of Appeals affirmed the chancellor's decision.

¶2. On December 12, 1995, Vulcan filed a petition for rehearing which was denied by order entered on January 30, 1996. Vulcan obtained an extension of time to file a petition for writ of certiorari until March 2, 1996. On February 26, 1996, Vulcan filed its petition for writ of certiorari. Miller filed a response to the petition on March 1, 1996. The petition was granted on April 25, 1996. Both parties filed supplemental briefs pursuant to M.R.A.P. 17(h).

## STATEMENT OF FACTS

¶3. In 1967, M.C. West, Inc., employed Edward E. Miller to explore for a deposit of limestone in Mississippi that could be developed commercially. Miller concluded that there was such a limestone deposit in Tishomingo County. Miller negotiated with the owners of three properties: the Sanders,

Gant, and Hiawassee properties. Miller obtained a mineral lease on the Sanders property and was negotiating with the others when West decided not to proceed further. West agreed to transfer unto Miller all the rights which the corporation had obtained for $10,000 and an option was drawn to that effect to be exercised within sixty days.

¶4. Miller entered into an agreement with Glen and George Lambert whereby Miller's option from West would be exercised by the Lamberts. Miller would receive a royalty of five cents per ton of limestone produced and $7,500 per year as an advance against the royalty. The agreement with the Lamberts provided in part the following:

> In the event Lambert should purchase any of the said pieces of land, the royalty to Miller shall continue as hereinabove provided.

> If Lambert should sell, assign or trade their rights under this agreement, it is understood that the obligations and responsibilities set forth herein shall be imposed upon the assignee or buyer.

> Lambert acknowledges that Miller discovered this mineral deposit and has made it possible for Lambert to do business in this regard. If Lambert should open any other business related to this industry, Lambert agrees to pay a royalty of five cents per ton on minerals produced from such other source.

¶5. The Lamberts transferred their interests to Magnolia Limestone Products, Inc. "[P]ursuant to formal action by its Board of Directors, Magnolia specifically ratified and adopted the Royalty Agreement and assumed all of the duties obligations and liabilities of the Lamberts under the terms and provisions of that Royalty Agreement." Magnolia later acquired fee simple title to mine all limestone on the Sanders property and the Gant property which were both specifically referred to by name and deed book in the Royalty Agreement. Magnolia also acquired fee simple title to the Hiawassee tract which was not specifically referred to in the Royalty Agreement. These three tracts were ultimately transferred to Real Estate Leasing Company [hereinafter Leasing].[1]

¶6. Leasing subsequently acquired fee simple title to the Reid property which was not specifically referred to in the Royalty Agreement. Leasing later conveyed fee simple title to the Sanders property, the Hiawassee property, and the Reid property, and the mineral interest in the Gant property to Mississippi Stone Company.

¶7. Mississippi Stone did not pay any royalties to Miller and Miller filed suit in the Chancery Court of Tishomingo County. The chancellor determined that Miller was entitled to royalties from the Sanders property, but not from the Gant and Hiawassee properties. Miller appealed to this Court and this Court found that Miller was entitled to receive royalties from the Sanders, Gant, and Hiawassee properties. *Miller v. Mississippi Stone Co.*, 379 So. 2d 919 (Miss. 1980).

¶8. Mississippi Stone subsequently conveyed fee simple title to the Hiawassee property, the Reid property, and the Sanders property, and the mineral interest in the Gant property to Granite Construction Company.[2] In accordance with this Court's decision, Granite paid Miller the royalty only on the Gant property, as no limestone had been quarried from the Sanders, Reid, or Hiawassee properties.

¶9. Later, Granite began mining operations of the Reid property and initially paid the royalty to Miller. Granite, however, determined that these payments were in error and declined to pay a royalty to Miller on the Reid property. Miller filed suit against Granite in the Chancery Court of Tishomingo County. Leasing was later added as a defendant. The chancellor determined that Leasing was the alter ego of Magnolia and, as a result, assumed all of Magnolia's obligations. Thus, Leasing was deemed to have assumed the future royalty obligation on limestone taken from any additional property Leasing acquired. This Court affirmed the chancellor's decision that Miller was entitled to the royalty on the Reid property without a written opinion. *Real Estate Leasing Co. v. Miller*, 435 So. 2d 688 (Miss. 1983).

¶10. Granite subsequently purchased the Tennessee River property which is the tract at issue in this case. This tract was purchased from the Tennessee River Pulp and Paper Company. Neither Miller, the Lamberts, Magnolia, nor Leasing ever owned or had any interest in this tract. In 1988, Granite conveyed its interest in all of its properties - Sanders, Gant, Hiawassee, Reid, and Tennessee River - to Vulcan Materials Company.[(3)]

¶11. Vulcan began mining operations on the Tennessee River property and declined to pay Miller any royalties for the limestone mined from this tract. Vulcan based its decision not to pay the royalty on the fact that neither Granite nor Vulcan, the only parties with any connection to Miller who have ever owned the Tennessee River property, assumed the future business obligation which the Lamberts had agreed to pay.

¶12. Miller filed suit against Vulcan in the Chancery Court of Tishomingo County and the chancellor ruled in Miller's favor. On appeal, the Court of Appeals affirmed the chancellor's decision. Vulcan filed a petition for writ of certiorari to which Miller filed a response. This Court granted the petition and the matter is now before this Court on the merits.

### STATEMENT OF ISSUES

I. Did the Chancellor err in ruling that the written agreement of September 27, 1968 between Edward E. Miller and George and Glen Lambert (herein referred to as the "Royalty Agreement") created real covenants which are valid and binding on any owner or subsequent owner of the fee simple title to, or the mineral interest in, the Tennessee River Pulp & Paper Company Property?

II. Did the Chancellor err in ruling that by its acceptance of the deed dated June 3, 1988, from Granite Construction Company, Vulcan Materials Company expressly assumed the obligation to pay Miller royalties on all limestone extracted and removed from the Tennessee River Pulp & Paper Company Property?

III. Did the Chancellor err in failing to rule that the royalty obligations to Edward E. Miller did not extend to a tract a property acquired by Vulcan Materials Company where Vulcan did not specifically assume the obligations under the Royalty Agreement and where the specific tract of property in question was never owned by Miller, the Lamberts, or any other party which had specifically assumed the obligation to pay royalties on Limestone extracted from the property?

IV. Did the Chancellor err in granting Miller's Motion for Summary Judgment and in denying Vulcan's Cross Motion for Summary judgment?

## LAW

### A. Analysis of this Court's previous holdings regarding the Royalty Agreement.

¶13. Vulcan claims that the provision in the royalty agreement that grants Miller an interest in any future acquired property was a personal covenant between the Lamberts and Miller. Since it was a personal covenant, Vulcan contends that the provision is not enforceable to other parties unless ratified. Miller asserts that the provision is a real covenant that runs with the land.

¶14. Applying this Court's rulings in *Miller v. Mississippi Stone Co.*, 379 So. 2d 919 (Miss. 1980) [hereinafter *Miller I*], and *Real Estate Leasing Co. v. Miller*, 435 So. 2d 688 (Miss. 1983) [hereinafter *Miller II*], the Court of Appeals determined that the royalty agreement was a real covenant running with the land.

¶15. In *Miller I*, Miller brought suit against Mississippi Stone for failure to pay royalties. The chancellor determined that Miller was entitled to royalties from the Sanders property, but not from the Gant and Hiawassee properties. This Court found that the agreement between the Lamberts and Miller did include the Gant and Hiawassee properties and required Mississippi Stone to pay royalties on these tracts as well as the Sanders property. In its opinion, however, the Court made no references to real or personal covenants. In coming to its conclusion, the Court noted that all parties had actual and constructive knowledge of the royalty agreement and that the royalty contracts between the Lamberts and Magnolia[4] specifically provided that Miller was to receive royalties on the Gant and Hiawassee tracts. The Court relied on the following language regarding the interpretations of contracts:

> In *Roberts v. Corum*, 236 Miss. 809, 112 So. 2d 550 (1959), the Court said:
>
> "Contracts are solemn obligations and it is not the function of the courts to make contracts for parties, but rather to give effect to them as written.
>
> . . . We think, however, that it is the sounder policy to adhere to the principle so deeply embedded in our jurisprudence that the plain and unambiguous language of a contract should be construed as written." 236 Miss. at 822, 112 So. 2d at 554, 555.

*Miller I*, 379 So. 2d at 921.

¶16. The Court of Appeals notes that this Court did not expressly find that the royalty agreement was a real covenant that runs with the land, but that its holding in *Miller I* implies such. Otherwise, since Mississippi Stone never ratified the agreement, "it could not logically be bound by the *personal covenant* as one generally has to specifically assume and ratify a personal covenant in order to be bound by it." See *Coggins v. Joseph*, 504 So. 2d 211, 214 (Miss. 1987). Likewise, the Court of Appeals reasons that Granite in *Miller II* did not ratify the royalty agreement and that this Court affirmed, without a written opinion, the chancellor's determination that Granite must pay Miller a royalty for limestone mined from the Reid property.

¶17. The chancellor in *Miller II*, however, did not find that the royalty agreement was a real covenant, but went to great lengths to find that Leasing was the alter ego of Magnolia who expressly ratified the royalty agreement.

¶18. In *Hood Industries v. King*, 255 So. 2d 912 (Miss. 1971), H.A. King and L.S. Kiser discovered a clay deposit. They entered into an agreement with Paul L. James and Herbert Dickson [hereinafter King agreement]. The King agreement provided that:

> King and Kiser had located certain strata of clay deposits in Kemper and Noxubee counties; that James and Dickson were interested in purchasing and manufacturing said clay; and that in consideration for showing said clay deposits to James and Dickson, and in the event James and Dickson desired to lease said clay for the purpose of manufacturing the same, King and Kiser would have the exclusive right to handle the leasing of clay in order that they might make a profit out of it.

*Hood*, 255 So. 2d at 913. James and Dickson organized a corporation by the name of Superior Clay and Products Corporation.

¶19. Superior secured ten leases pursuant to the agreement, but was unable to finance construction of a brick plant, and Atlas Tile and Brick Company, Inc., was organized with essentially the same management as Superior. Atlas changed its name and later merged into Mississippi Industries, Inc., which later changed its name to Hood Industries, Inc. Mississippi Industries entered into an oral agreement to mine clay from a tract adjoining the lands embraced in the original ten leases. This Court found that Hood was liable for the royalty on the adjoining lands since Atlas's board of directors assumed the King agreement in its entirety and Hood assumed Atlas's liabilities through the corporate merger. *Hood*, 255 So. 2d at 916.

¶20. Vulcan contends that if the Court of Appeals is correct in that the royalty agreement is a real covenant that runs with the land, it was unnecessary for the chancellor in *Miller II* to determine that Leasing was the alter ego of Magnolia. Furthermore, it was unnecessary for this Court in *Hood* to determine that Atlas assumed the King agreement and that Hood assumed Atlas's liabilities through a corporate merger.

¶21. Judge Southwick's dissent claims that the majority has turned the covenant into a "virus running with the land, not just burdening the original land but infecting every other parcel to which an owner of one of the original parcels comes into contact." The dissent focuses on the requirements necessary for a covenant that runs with the land. "Both parties agree that such a covenant must satisfy three conditions: it must 'touch and concern' the land; the covenant must have been intended by the parties to bind successors; and there must be privity between the original parties and successors, or at least notice to those successors. *Mendrop v. Harrell*, 233 Miss. 679, 103 So. 2d 418, 422-23 (1958); *Black's Law Dictionary* 365 (6th ed. 1991)." *See also* 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 13 (1995).

¶22. The dissent contends that the royalty agreement fails to "touch and concern" any land. The burden is not on the lands originally owned by the parties, but on the lands purchased later by other parties. "[I]n essence . . . Miller's interest leaps out from the original parcels and attaches to a new parcel."

¶23. Finally, the dissent claims that *Miller I* "does no more than hold that the first assignee from Lambert, who affirmatively assumed the obligations Lambert had, was bound by the terms." Furthermore, *Miller II* has no precedential value because there was no written opinion. M.R.A.P. 35-A(d).

¶24. Judge Southwick is correct in his assessment of *Miller I* and *Miller II*. The majority implied too much from this Court's previous holdings regarding the royalty agreement. This Court must now address the situation at hand.

<u>B. The merits of the case at hand.</u>

Did the chancellor err in determining that Miller was entitled to a royalty from Vulcan on the Tennessee River property?[(5)]

¶25. The question before this Court is whether the chancellor erred in determining that the provision in the royalty agreement is a real covenant running with the land and whether Vulcan expressly assumed the obligation to pay Miller the royalty on the Tennessee River property by accepting the deed from Granite. In the Opinion and Judgement of the Court, the chancellor made the following conclusions of law:

(a) The provisions in the written agreement between Miller and George and Glen Lambert dated September 27, 1968, (the "Royalty Agreement") that "Lambert agrees to pay a royalty of five cents per ton on materials produced from such other source," and that "the obligations and responsibilities set forth herein shall be imposed on the assignee or buyer" if the Lamberts were to sell or assign their rights under the Royalty Agreement, were and are real covenants running with the land, and are valid and binding on any owner or subsequent owner of the fee simple title to, or the mineral interest in, the Sanders Property, the Gant Property, the Hiawassee Property, the Reid Property, and the Tennessee River Pulp & Paper Company Property;

(b) By accepting the deed dated June 3, 1988, from Granite Construction Company, Vulcan expressly assumed the obligation to pay Miller royalty on all limestone extracted and removed from all eight tracts described therein, including the Tennessee River Pulp & Paper Company Property . . . .

¶26. The Court of Appeals affirmed the chancellor finding that "all subsequent assignees or buyers are bound by the terms of the agreement between Miller and Lambert." As a result, the Court of Appeals determined that the royalty agreement was a real covenant and not merely a personal covenant.

All covenants having to do with realty or the use thereof are either real or personal. The main distinction between the two lies in the nature of the rights they create. Generally speaking, a personal covenant creates a personal obligation or right enforceable at law only between the original covenanting parties, whereas a real covenant creates a servitude upon the realty (the servient estate) for the benefit of another parcel of land (the dominant estate). A real covenant binds the heirs and assigns of the original covenantor, while a personal covenant does not, except in certain circumstances where those who take land have notice of restrictive covenants pertaining to it. Put another way, a covenant may "run with the land," or may simply be a matter

between the grantor and the purchaser. The distinction between covenants which run with land and covenants which are personal depends upon the purpose and effect of the covenant substantially to alter the legal rights which otherwise would flow from ownership of land and which are connected with the land.

20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 12 (1995) (footnotes omitted).

¶27. As discussed above, a covenant must meet three conditions in order to run with the land:

For a covenant to be real rather than personal, it must be shown that (1) the covenanting parties intended to create such a covenant; (2) privity of estate exists between the person claiming the right to enforce the covenant and the person upon whom the burden of the covenant is to be imposed; and (3) the covenant "touches and concerns" the land in question.

20 *id.* § 13.

¶28. Judge Southwick, in his dissent, argued that the royalty agreement did not meet all of the conditions necessary to constitute a real covenant. According to Judge Southwick, the royalty agreement does not "touch and concern" the Tennessee River property.

The requirement that a covenant, to be a real rather than a personal covenant, "touch and concern" the land has been explicated in various terms. It has been said that to meet this requirement, the covenant must be so related to the land as to enhance its value and confer a benefit upon it, or, conversely, impose a burden on it. Other authority defines the phrase by saying that to touch and concern the land, a covenant must bear upon the use and enjoyment of the land, and must be of the kind that an owner of an estate or interest in land may make because of his ownership right.

20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 15 (1995) (footnotes omitted). Furthermore:

The test whether a covenant will or will not run with the land depends not so much on whether it is to be performed on the land itself as on whether it tends directly or necessarily to enhance its value or render it more beneficial or convenient to those by whom it is owned or occupied. Those covenants that are generally held to run with the land and to inure to the benefit of the assignee are such as ordinarily affect the land itself and confer a benefit on the grantor.

*A covenant that imposes a burden on real property for the benefit of the grantor personally does not follow the land into the possession of an assignee, for such a covenant is personal to the grantor and does not run with the land*, although the deed may expressly state that the covenant runs with the property.

20 *id.* § 19 (emphasis added) (footnotes omitted).

¶29. Since the burden that would be placed on the Tennessee River property by the royalty agreement would not enhance its value or render the property more beneficial or convenient to its owner or occupant and instead merely imposes a benefit for Miller personally, the covenant does not run with the land. Thus, Vulcan would have had to assume the obligation to pay the royalty to Miller.

¶30. The chancellor, however, did find that Vulcan expressly assumed the obligation to pay the royalty to Miller by accepting the deed from Granite. The deed lists all of the tracts of property and then provides the following:

> To have and to hold said property together will all appurtenances thereto to said VULCAN MATERIALS COMPANY and its assigns forever. *And, with the exceptions of (i) the claims or rights of Edward E. Miller, his heirs, executors, administrators and assigns relating to said real property or the products thereof*, and (ii) that certain unrecorded Limestone Royalty Agreement executed by and between Grantor and Real Estate Leasing Co., Inc., dated January 7, 1986, and referenced in that certain Warranty Deed filed for record in Book B117, pages 623-24 of the land records of Tishomingo County, Mississippi, which, in the case of (i) and (ii), result from Grantee's ownership or use of said property, including, without limitation, Grantee's extraction and removal of stone or other products thereof (*which obligations or liabilities Grantee hereby assumes upon acceptance of this Deed*), Grantor warrants specially to Grantee the real property conveyed hereby.

(emphasis added).

¶31. As noted by Judge Thomas in his majority, the parties are sophisticated businessmen with "a vast amount of knowledge concerning contracts." Furthermore, "Vulcan had both actual and constructive knowledge of Miller's rights to the limestone quarry." In the deed from Granite, the rights conveyed to Vulcan excepted the claims or rights of Miller. Miller's interest in the property is based solely on the royalty agreement. Vulcan reasonably should have known of the litigation which ensued from Miller's claims pursuant to the royalty agreement, yet Vulcan made no attempt to limit Miller's interest to any specific tracts of land or in any way limit Miller's rights as provided in the royalty agreement. Vulcan is obligated to pay Miller the royalty pursuant to the royalty agreement not because it is a real covenant running with the land, but because Vulcan assumed the obligation in the deed from Granite.

## ¶32. JUDGMENT IS AFFIRMED.

**SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS AND SMITH, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. DAN LEE, C.J., DISSSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS, J.**

### DAN LEE, CHIEF JUSTICE, DISSENTING:

¶33. With respect for the view of the majority, I believe they have misinterpreted this Court's prior decisions in related cases in finding Vulcan obligated to Miller for royalty payments on the Tennessee River property. By affirming the Court of Appeals, the majority has, as the Court of Appeals' dissent notes, "turned the covenant into a virus running with the land, not just burdening the original land but infecting every other parcel to which an owner of one of the original parcels comes into contact." I fear that the result reached by today's majority will be a giant leap backward for property law in the

State of Mississippi. Therefore, I respectfully dissent.

¶34. There are two issues before this Court. The first is whether the relevant 1968 agreement was a covenant running with the land. The second is whether the language contained in the deed from Granite to Vulcan Materials was sufficient to impose liability on Vulcan for royalty payments on limestone quarried from the Tennessee River property.

¶35. The majority finds correctly that the 1968 agreement does not meet muster to be considered a real covenant running with the land. However, today's majority allows the language contained in the deed to improperly expand the obligations Vulcan had to Miller.

¶36. The majority correctly finds that:

> [s]ince the burden that would be placed on the Tennessee River property by the royalty agreement would not enhance its value or render the property more beneficial or convenient to its owner or occupant and instead merely imposes a benefit for Miller personally, the covenant does not run with the land.

Maj. op. at 12.

¶37. The majority notes, "[t]hus, Vulcan would have had to assume the obligation to pay the royalty to Miller." *Id.* Unfortunately, the majority then finds that "Vulcan is obligated to pay Miller the royalty payments pursuant to the royalty agreement not because it is a real covenant running with the land, but because Vulcan assumed the obligation in the deed from Granite." Maj. op. at 13-14. I believe this is an incorrect and over broad reading of the deed.

¶38. Admittedly, Vulcan assumed some obligation to pay. It was not by operation of law or by express agreement, it was through exceptions to the deed into Vulcan from Granite Construction Company (Granite). The exceptions included the claims or rights of Edward E. Miller relating to said property or the products thereof, and an unrecorded Limestone Royalty Agreement executed by and between Grantor (Granite) and Real Estate Leasing Co., Inc. (Leasing), dated January 7, 1986. The second exception is not applicable to the case *sub judice* and no further mention is made in the record of the Limestone Royalty Agreement referenced in the Vulcan deed. The chancellor, the Court of Appeals and today's majority discuss only the 1968 Miller/Lambert Royalty Agreement.

¶39. The relevant exception is a title conveyance exception which cannot expand the rights of a party who was not a party to the Granite/Vulcan transfer. Four of the properties conveyed by the deed were already subject to a royalty agreement, and the obligations imposed on these properties had to be excepted from the warranty of conveyance. Vulcan took these four properties subject to the royalty and paid the royalty on all limestone it removed from the encumbered tracts. Except for Granite, the fifth tract, the Tennessee River property and the tract in question, was never owned by Miller or any of the other previous owners of the four tracts subject to the royalty obligation. Therefore, the question before the Court is what limestone mineral interest, if any, did Miller have in the Tennessee River property. To answer this, we must look to the language of the 1968 Agreement between Miller and the Lamberts, and its subsequent interpretation by this Court in *Miller I* and *Miller II*.

¶40. On September 27, 1968, Miller entered into an agreement with Glen and George Lambert whereby Miller would receive a royalty of five cents per ton of limestone produced on the Sanders property and $7,500 per year as an advance against the royalty. The agreement with the Lamberts provided in part the following:

> In the event Lambert should purchase any of the said pieces of land, the royalty to Miller shall continue as hereinabove provided.

> If Lambert should sell, assign or trade their rights under this agreement, it is understood that the obligations and responsibilities set forth herein shall be imposed upon the assignee or buyer.

> Lambert acknowledges that Miller discovered this mineral deposit and has made it possible for Lambert to do business in this regard. If Lambert should open any other business related to this industry, Lambert agrees to pay a royalty of five cents per ton on minerals produced from such other source.

¶41. The Lamberts subsequently transferred their interests to Magnolia Limestone Products, Inc. Magnolia specifically ratified and adopted the royalty agreement and assumed all of the duties obligations and liabilities of the Lamberts under the terms and provisions of that royalty agreement. Magnolia later acquired fee simple title to mine all of the limestone on the Sanders, Gant and Hiawassee property.

¶42. All of the mineral interests which were owned by Magnolia in these three tracts of land were eventually transferred to Leasing, a Mississippi corporation which was owned by the same individuals as Magnolia. During its ownership of the Sanders, Gant and Hiawasee properties, Leasing acquired the Reid property. Leasing conveyed its interest in all four of these tracts to Mississippi Stone. Mississippi Stone did not ratify or adopt the royalty agreement and failed to make royalty payments to Miller. Miller filed suit and the judgment was appealed.

¶43. This Court, in *Miller I*, found that the agreement between the Lamberts and Miller did include the Gant and Hiawassee properties and required Mississippi Stone to pay royalties on these tracts as well as the Sanders property. The Court reasoned that all parties had actual and constructive knowledge of the royalty agreement and that the royalty contracts between the Lamberts and Magnolia specifically provided that Miller was to receive royalties on the Gant and Hiawassee tracts. Magnolia had specifically ratified the royalty agreement, Magnolia transferred its rights to Leasing, which was later determined to be Magnolia's alter ego, and Leasing then transferred its rights to Mississippi Stone.

¶44. Thus, Miller was owed royalties on limestone mined from certain property because previous owners or lessees of the property, the Lamberts, Magnolia or Leasing, had entered into or specifically assumed the royalty agreement. Therefore, subsequent transferees of the property acquired by these entities took the property subject to the royalties owed to Miller. However, the Tennessee River property was never owned by any of these entities.

¶45. This Court followed this reasoning previously in *Hood Industries v. King*, 255 So. 2d 912 (Miss. 1971). In *Hood*, H.A. King and L.S. Kiser discovered a clay deposit. They entered into an agreement (hereinafter King agreement) with Paul L. James and Herbert Dickson. The King

agreement provided that:

> King and Kiser had located certain strata of clay deposits in Kemper and Noxubee counties; that James and Dickson were interested in purchasing and manufacturing said clay; and that in consideration for showing said clay deposits to James and Dickson, and in the event James and Dickson desired to lease said clay for the purpose of manufacturing the same, King and Kiser would have the exclusive right to handle the leasing of clay in order that they might make a profit out of it.

*Hood*, 255 So. 2d at 913. James and Dickson organized a corporation by the name of Superior Clay and Products Corporation (Superior). Superior secured ten leases pursuant to the agreement.

¶46. Superior was unable to finance construction of a brick plant, and Atlas Tile and Brick Company, Inc. (Atlas), was organized with essentially the same management as Superior. Atlas changed its name and later merged into Mississippi Industries, Inc., which later changed its name to Hood Industries, Inc. (Hood). Mississippi Industries entered into an oral agreement to mine clay from a tract adjoining the lands embraced in the original ten leases. This Court found that Hood was liable for the royalty on the adjoining lands since Atlas's board of directors assumed the King agreement in its entirety and Hood assumed Atlas's liabilities through the corporate merger. *Hood*, 255 So. 2d at 916.

¶47. In the present case, Mississippi Stone eventually conveyed its interest in the Gant, Sanders, Hiawassee and Reid property to Granite. Like Mississippi Stone, the board of directors of Granite did not ratify or adopt the royalty agreement or assume the duties, obligations, and liabilities of the Lamberts under the terms and provisions of the royalty agreement. Although Granite originally paid royalty payments to Miller on all limestone removed from its quarries, it later decided not to pay royalties on limestone removed from the Reid property. Once again, Miller filed suit.

¶48. The chancellor found that the Reid property had become subject to the royalty obligation because it was first acquired by Leasing which, as an alter ego of Magnolia, was deemed to have assumed the royalty agreement. The chancellor clearly stated that "Miller is entitled to receive a royalty of five cents (5¢) per ton on all limestone, sand, gravel and clay removed from the Reid property *and from any other property in which Lambert, Magnolia, or Leasing Company had, now have, or may hereafter have any mineral interest.*" (emphasis added). Subsequent owners of the Reid tract had to pay royalties to Miller on limestone taken from that property. The judgment was appealed and this Court affirmed the chancellor *per curiam.*

¶49. Thus, we have held that all of the property initially acquired by Mississippi Stone from Leasing and Granite from Mississippi Stone was already subject to the obligation to pay the royalties to Miller. The Lamberts entered into the royalty agreement. Magnolia and Leasing affirmatively assumed the royalty agreement, thereby agreeing to pay royalties on both presently owned and future acquired property. Once any property was acquired by any one of these entities, the royalty obligation such entity assumed then attached, and the duty to pay the royalties on limestone mined from that specific tract applied regardless of the party acquiring that specific tract in the future. Each subsequent purchaser acquired those properties subject to the existing duty to pay the royalties on those tracts alone.

¶50. In 1986, Granite acquired fee simple title to an additional tract of land known as the Tennessee River property from Tennessee River Pulp and Paper Company, a Delaware corporation *unrelated to Miller, the Lamberts, Magnolia, Leasing or Mississippi Stone. None of these entities had ever owned any interest in the Tennessee River property.* Two years later, Granite conveyed its interest in the Gant, Sanders, Hiawasee, Reid and Tennessee River properties to Vulcan. Vulcan did not ratify or adopt the royalty agreement or expressly assume the duties, obligations, and liabilities of the Lamberts under the terms of the royalty agreement. Regardless, by taking the deed, Vulcan assumed all of Granite's existing obligations to Miller; however, the deed cannot expand the existing obligations assumed by Vulcan. *Since Granite never assumed the future royalty obligation to Miller, nor was it an alter ego of an entity that had assumed the obligation, the Tennessee River property, acquired from an unrelated party, never became subject to the future royalty obligation.* This is an important distinction, and separates the Tennessee River property from all other property Vulcan acquired by deed from Granite. The deed only encompasses obligations already owed by Granite to Miller.

¶51. At no time has the chancellor or this Court held that any property not owned or acquired by the Lamberts, Magnolia, or Leasing was subject to the future royalty obligation under the royalty agreement. The Tennessee River property was never owned nor was there ever any interest held in it by the Lamberts, Magnolia, or Leasing. As the obligation under the royalty agreement never attached to the Tennessee River property, it could not be included in the assumed obligations of Vulcan by deed from Granite.

¶52. Absent an express assumption of Lambert's contractual promise to pay royalty from land subsequently purchased, Vulcan is not bound to pay anything on the lands involved in this suit. The chancellor erred in determining that the covenant between Miller and the Lamberts was a real covenant that runs with the land and that Vulcan expressly assumed the obligations of the royalty agreement. Vulcan does not owe Miller any royalties for limestone removed from its quarry on the Tennessee River property. This case should be reversed and rendered.

¶53. Therefore, I respectfully dissent.

**MILLS, J., JOINS THIS OPINION.**

1. The owners of Magnolia and the owners of Leasing were the same individuals.

2. Granite is unrelated to and is not the alter ego of the Lamberts, Magnolia, Leasing, or Mississippi Stone.

3. Vulcan is not related to and is not the alter ego of Granite. Furthermore, Vulcan is not related to and is not the alter ego of the Lamberts, Magnolia, Leasing, or Mississippi Stone.

4. Magnolia expressly ratified the royalty agreement. It transferred its rights to Leasing which was later determined to be Magnolia's alter ego. Leasing then transferred its rights to Mississippi Stone.

5. The statement of issues raised by Vulcan can be summed up and addressed as one issue.