MENDROP, et al. *v.* HARRELL, et al.

No. 40668 June 9, 1958 103 So. 2d 418

680

*Dabney & Dabney,* Vicksburg, for appellants.

*Brunini, Everett, Grantham & Quinn, Oscar P. La Barre, Robert M. Koestler,* Vicksburg, for appellees.

ETHRIDGE, J.

This case involves an affirmative covenant running with the land, to pay the cost of paving an adjacent street in a subdivision, and questions concerning the extent of that covenant, the existence of a lien upon the property conveyed, and its effect upon a subsequent mortgagee with constructive notice.

## I.

Appellants, Mr. and Mrs. Robert E. Mendrop and Mr. and Mrs. Wallace M. Gay (referred to as Mendrop and Gay), brought suit in the Chancery Court of Warren County to enforce a lien resulting from an affirmative covenant running with the land, against two lots in a subdivision.

Defendant-appellees, Mr. and Mrs. O'Bryant McNair, are the present owners of Lot 17, Sylvan Flats Subdivision, Defendant-appellees, Mr. and Mrs. W. E. Buchanan, are the present owners of Lot 18 of that subdivision. Defendant-appellee, First Federal Savings and Loan Association, (called First Federal), and Loretto A. Conaty, trustee, are the beneficiary and trustee, respectively, of deeds of trust executed by the present owners of these lots. Defendant-appellee, Henry W. Harrell, was the original purchaser of the lots from Mendrop and Gay, who started developing the subdivision in 1953. The subdivision and Lots 17 and 18 are on the west side of Porter's Chapel road, which runs north and south; the lots face east. This is a public road, paved with "black-top" when the subdivision was created.

The subdivision's recorded plat shows a road running between Lot 17 and Lot 18, 50 feet in width and 176.9 feet in length, which is approximately the length or depth of the two lots. That road had not been opened by grading or paving on August 23, 1955, when Mendrop and Gay conveyed Lots 17 and 18 to Harrell for a consideration of $2,500, with $600 in cash and the balance of $1,900 secured by a promissory note and deed of trust, payable to vendors in 48 monthly installments. After these recitations, the deed continued:

"As a part of the consideration for the sale of said property to the Vendee herein, the said Vendee agrees that he and his successors in title will observe the following restrictions and covenants which are to run with the land:

\* \* \* \*

"7. It is further understood and agreed that said Henry W. Harrell and his successors in title agree to bear all the expense required of them incidental to any street or sidewalk paving that may be done in the future, adjacent to the property owned by said Henry W. Harrell, described in this instrument.

"8. These covenants are to run with the land, and shall be binding on all parties and all persons claiming under them for a period of twenty-five (25) years from the date these covenants and agreements are recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years unless an instrument signed by a majority of lot owners in Sylvan Flats Subdivision (and any additions thereto) has been recorded agreeing to change said covenants in whole or in part.

"9. Enforcement shall be by proceeding at law in equity against any person or persons violating or attempting to violate any agreement, either to restrain violation or to recover damages.

\* \* \* \*

"The Grantee herein will execute a Deed of Trust to cumulatively secure the balance of the purchase price. Any legal assignment or cancellation of the Deed of Trust will operate as an assignment or cancellation of the Vendor's lien herein."

Every deed conveying lots in the subdivision contains similar provisions, as in the deed to Harrell. Harrell executed to Mendrop and Gay his deed of trust and note to secure the unpaid purchase money. In November 1953 Mendrop and Gay created a first addition to the subdivision, and in September 1956, a second addition. These additions were pursuant to the owners' plan to gradually add additional lots for further development. Mendrop and Gay still own other lots and parts of the subdivision.

Appellee Harrell had purchased four other lots in the subdivision from Mendrop and Gay before he bought Lots 17 and 18 on August 23, 1955. On these other lots he built homes which he would sell to purchasers, and thereafter would pay the balance of the purchase price of the lots to Mendrop and Gay. His usual arrangement with them was informal. He would pay by check $100 for an oral option to purchase the lot, would then build the house on it, and after sale would pay Mendrop and Gay the balance of the purchase price. Prior to buying Lots 17 and 18, Harrell had readily paid for the paving costs in front of four lots. Other property owners did the same.

After Mendrop and Gay purchased the land in 1953, they installed water lines, curbs, gutters, and paved streets. These improvements were made in order to enable purchasers of the lots to obtain loans insured by the Federal Housing Administration and the Veterans Administration. For example, the first street paved, Clayton Drive, was constructed by appellants, with the adjacent property owners paying their proportionate paving costs. It was inspected and accepted by the county engineer, dedicated to public use, and accepted by the board of supervisors for maintenance. The county would not pay any paving costs of the streets, but paved streets were necessary in order to develop the subdivision.

In October 1955 appellants decided to grade and pave the platted street between Lots 17 and 18. It runs in front of several lots in the second addition. Harrell objected, and refused to permit the bulldozer operator, who was sent to clear the street's area, to do so. He claimed he was not obligated to pay for paving; that Clause 7 in the deed had reference to street paving which might be done in the future by the county or other governmental subdivisions, and not by the subdivision developers, Mendrop and Gay. With this controversy existing, Mendrop and Gay, and their attorneys, and Harrell and his attor-

ney, held a meeting in December 1955. Mendrop and Gay testified that it was agreed among them that Harrell would pay for the paving and would not obstruct the work, but Harrell denied this.

On January 16, 1956, Harrell contracted with the Buchanans to sell them Lot 18. The contract states that street paving, sidewalk, curb and gutters are "paid". Harrell's agent, Johnny Jabour, negotiated the sale of the lot and the house being constructed by Harrell on it. Buchanan said that Jabour told him that there would probably be no paving. On February 11, 1956, Harrell conveyed Lot 18 to the Buchanans. At the same time Buchanan obtained the purchase money from appellee First Federal by executing a note and deed of trust to it. Buchanan said that when he bought Lot 18 the right-of-way was cleared and grubbed, but the road was not paved. He did not examine the recorded plat of the subdivision.

Harrell contracted with McNair for the sale of Lot 17 on July 8, 1955, but, since Harrell later increased his sale price $250, the July contract was amended and a new contract executed on December 6, 1955. Harrell conceded that this was after the December meeting with Mendrop and Gay, but he stated that the additional amount had nothing to do with paving costs. The McNair contract also stated that street paving and curb and gutter were "paid".

On January 14, 1956, Harrell conveyed Lot 17 to the McNairs. The deed recited that it was subject to the protective covenants for the subdivision and also "to the terms mentioned in that certain deed" to Harrell from Mendrop and Gay. On the same date the McNairs obtained the purchase price for their house and lot by executing a note and deed of trust to appellee First Federal. McNair testified that Jabour said the street would be constructed but that Harrell would have to pay for it, and that he understood the extra $250 which Harrell charged him for the house was for the cost of paving.

When First Federal made loans to McNair on January 14, 1956, and to Buchanan on February 11, 1956, the grading and grubbing of the street had begun, but First Federal had no actual notice thereof. Of course it had constructive notice of the recorded provisions of the deed from Mendrop and Gay to Harrell, and of the subdivision map. Vance cut the road with his bulldozer in the first week in January 1956.

After the street was graded, appellants in March 1956 constructed a concrete curb and gutter in the street between Lots 17 and 18, and in May 1956, they paved the street between the two lots. The total proportionate cost of the curb, gutter and pavement for the McNairs' Lot 17 was $608.77, and for Buchanans' Lot 18 to the south of the street was $599.86.

Appellants filed separate suits as to each lot. These cases were consolidated for trial. The prayer of the bills asked that a lien be decreed in favor of complainants upon the lots for their respective costs of paving, curb and gutter, that the lots be sold and the monies received from the sales be first applied to the satisfaction of the paving liens. A personal decree against defendants was not requested. The Buchanans' answer denied existence of the claimed lien, but contained no cross bill against Harrell. The McNairs' answer denied the claimed lien, and by cross bill asked that, in the event judgment should be given creating a lien against their Lot 17, the court give them a judgment against Harrell for the amount of the curb, gutter and paving costs, Harrell having contracted with them that there were no special charges therefor against their property.

The chancellor did not render any finding of fact. His final decrees dismissed with prejudice the bill of complaint as against Conaty, First Federal, the McNairs and Buchanans, and the cross bill of the McNairs. The court held that Par. 7 of the deed to Harrell ". . . does not create a lien upon the property conveyed, even though

it might be construed as a covenant that runs with the land. The Court is convinced from the evidence and so finds that the Complainants were induced to convey Lots 17 and 18 to the co-defendant, Harrell, for the total consideration of $1,250 per lot rather than $1,500 per lot, relying on co-defendant's, Harrell's, statement that he would contribute to paying a part of the cost of paving the street, between Lots 17 and 18 in Sylvan Flats Subdivision.'' Hence the court gave Mendrop and Gay a judgment against Harrell for $500. Mendrop and Gay appealed, Harrell cross-appealed from the $500 judgment rendered against him, but the McNairs took no appeal from the dismissal of their cross bill against Harrell.

## II.

The principal question is whether Par. 7 in the deed to Harrell, dated August 23, 1955, and quoted above, constitutes an effective, affirmative covenant running with the land. Rules governing the construction of covenants imposing restrictions and burdens on the use of land are the same as those applicable to any contract or covenant. The language used will be read in its ordinary sense, and the restriction and burden will be construed in the light of the circumstances surrounding its formulation, with the idea of carrying out its object, purpose and intent. They are to be fairly and reasonably interpreted according to their apparent purpose. Carter v. Pace, 86 So. 2d 360 (Miss. 1956) ; 7 Thompson, Real Property (1940), Sec. 3569.

Clearly the parties intended this covenant to run with the land. The deed expressly so states at two places. It is also an affirmative covenant requiring grantee Harrell and his successors in title ''. . . to bear all the expense required of them incidental to any street or sidewalk paving that may be done in the future, adjacent to the property . . .''

■■ ■ The three annotations in 41 A. L. R. 1363 (1926), 102 A. L. R. 784 (1936), and 118 A. L. R. 983 (1939), contain a comprehensive discussion of the many cases considering and enforcing "affirmative covenants as running with land." 41 A. L. R. 1364 accurately states the recognized rule: "The courts of the United States, with the exception of New York, do not appear to make any distinction between affirmative covenants and negative or restrictive covenants as regards their running with the land, and in fact do not usually designate affirmative covenants as such. The only consideration in deciding whether a covenant runs with the land appears to be whether it is so related to the land as to enhance its value and confer a benefit upon it, rather than whether the covenant is of an affirmative or negative nature." Moreover, the New York Courts have departed from their earlier position by the use of numerous exceptions, and are today practically in line with the otherwise universal doctrine in this respect. Neponsit Property Owners' Association, Inc. v. Emigrant Industrial Savings Bank, 278 N. Y. 248, 704, 15 N. E. 2d 793, 16 N. E. 2d 852, 118 A. L. R. 973 (1938).

The three A. L. R. annotations cited above discuss numerous cases dealing with a wide variety of affirmative covenants running with the land, which the courts uniformly enforce. Illustrations are covenants to maintain or repair a dam, to furnish water power, to pay part of the cost of a party wall, to erect or maintain a fence, to establish depot or stopping place on railroad, to establish and maintain railroad or railroad crossings, to construct switch or siding, to construct culvert or cattle guard, to furnish gas, to pay taxes, to pay lessee for improvements, to pay rent, to repair, to erect or maintain building or other structure, and numerous other similar covenants. The courts further recognize that covenants to pay part of the cost of making or maintaining general improvements can be created to run with the land. 102

A. L. R. 784; 118 A. L. R. 783; Neponsit Property Owners' Association, Inc. v. Emigrant Industrial Savings Bank, supra; Everett Factories and Terminal Corporation v. Oldetyme Distillers Corporation, 300 Mass. 499, 15 N. E. 2d 829 (1938).

 A covenant imposing a burden will run with the land as readily as one conferring a benefit, although the rule does not apply to unreasonable burdens. The material inquiries are whether the parties meant to charge the land and whether the burden is one so related to the lands that it may be imposed consistently with policy and principle. 21 C. J. S., Covenants, Section 69; Maher v. Cleveland Union Stockyards Co., 55 Ohio App. 412, 9 N. E. 2d 995 (1936); 14 Am. Jur., Covenants, Sections 28-33; 7 Thompson, Real Property (1940), Section 3622.

In brief, the covenant in the 1955 deed from Mendrop and Gay to Harrell is a valid, affirmative covenant running with the land, by which the land is burdened with an obligation to pay the expenses incidental to street paving which might be done. It is so related to the land as to enhance its value and confer a benefit upon it. It is also beneficial to the property and lots in the subdivision owned by appellants and by other property owners therein.

 Moreover, we think that a fair construction of the covenant, in the light of the facts and circumstances existing at the time of its execution, and according to its terminology, show that the parties intended that the covenant include the expense or costs of the construction of street paving, and also curbs and gutters. The provision expressly refers to expenses "incidental to any street or sidewalk paving that may be done in the future, adjacent to the property."

Discussing the words "pave" and "paving", 70 C. J. S., p. 184, says: "As a comprehensive term it implies all things necessary to, and immediately connected with,

the construction of a firm, convenient, and suitable surface, including the necessary preparation. It may include the curbing and guttering of a street; necessary surface grading, although substantial grading may not be included; the laying or flagging of a sidewalk; and repaving.'' 31 A, Words and Phrases (1957), pp. 167-169, 172; Bailey v. Des Moines, 138 N. W. 853, 856 (1912); Fort Smith Pav. Dist. No. 7 v. Brun, 105 Ark. 65, 150 S. W. 154 (1912).

### III.

██ █ This affirmative covenant running with the land also created for its enforcement a charge or lien upon the land. The intention of the parties is the test, with resort to the words of the covenant read in the light of the surroundings of the parties and the subject of the grant. 7 Thompson, Ibid., Section 3620. The covenant provides that Harrell and his successors in title agree to bear the expenses for paving to be done in the future. At two places the deed states that this covenant is ''to run with the land.'' Clearly the parties intended that this affirmative covenant should run with the land and constitute a lien on it.

21 C. J. S., Covenants, Section 73, summarizes the pertinent rule: ''A lien or charge fixed on land by a covenant may run with the land and follow it into the hands of subsequent purchasers, such as a covenant to pay rent, or to make repairs or divide the expense of repairs. Likewise, unless otherwise controlled by statute, a covenant to pay taxes and assessments has been held to run with the land . . .'' Kennilwood Owners' Association v. Jaybro Realty & Development Co., 156 Misc. 604, 281 N. Y. S. 541 (1935).

 A covenant that is incident to the property conveyed and affects its value runs with the land and binds a subsequent purchaser. 7 Thompson, Ibid., Section 3622. Moreover, the naming of the covenantors, assigns and successors in title is of importance as showing an

intention that the provision is annexed to the real property conveyed. Ibid., Section 3627. ■ ■ A covenant running with the land can be enforced by the owner of some part of the dominant land for the benefit of which the covenant was made, namely, the appellants, owners of other parts of the subdivision. Ibid., Sections 3655, 3656. Manifestly, it would be useless and ineffectual to create a covenant running with the land unless it also imposed on the property a lien for its enforcement. Nor is it necessary that the deed containing a covenant of this type expressly state that it shall constitute a lien.

■ ■ Appellees rely on this provision in the deed to Harrell: "Any legal assignment or cancellation of the deed of trust will operate as an assignment or cancellation of the vendor's lien herein." They contend that, when Harrell paid Mendrop and Gay the balance of his purchase price for the lots, and his deed of trust was cancelled, any lien appellants had was thereby cancelled. However, the deed does not so provide; it states that the "vendor's lien" would be cancelled by cancellation of the deed of trust. Manifestly there was no intent that such action would cancel the lien of the affirmative covenant for paving, which is to run for more than twenty-five years, while Harrell's deed of trust was for a period of four years. Cancellation of the vendor's lien did not cancel the lien arising from the affirmative covenant running with the land.

■ ■ Another question is whether appellants' liens on the two lots is prior to that of First Federal's deeds of trust. A subdivision plat was on record and constituted constructive notice to First Federal of the development plan for the subdivision. 7 Thompson, Real Property (1940), Section 3582. The 1955 deed from appellants to Harrell creating the covenant was on record at the time First Federal loaned its money to the McNairs and Buchanans, and took its deeds of trust. The lender had constructive notice of the existence of the affirmative

covenant. The deed from Harrell to McNair specifically referred to the 1955 deed; that from Harrell to the Buchanans did not. ■■ However, the 1955 deed nevertheless constituted constructive notice to First Federal of its terms and restrictions, because, "a subsequent grantee is required to take notice of a building restriction contained in the original deed, even though such restriction does not appear in the subsequent deeds." Thompson, Ibid., Sections 3616, 3614. ■■ A court of equity will enforce any acceptable agreement affecting land against a purchaser with notice of it. Ibid., Section 3615. In brief, First Federal's deeds of trust, with appellee Conaty as trustee, being later in time to appellants' recorded covenant, and First Federal having constructive notice of it, are subordinate to appellants' lien.

For the foregoing reasons, the decrees of the chancery court are reversed on both direct and cross-appeals, and judgment is rendered here adjudicating that appellants have a lien upon the McNairs' Lot 17 for the paving costs in the amount of $608.77, and upon the Buchanans' Lot 18 for the paving costs in the amount of $599.86, which is prior to the lien of the deeds of trust to appellee Conaty, trustee, and appellee, First Federal, beneficiary. Appellants in their bills of complaint asked only for the imposition of liens upon these two lots, prior to First Federal's deeds of trust. For that reason, we do not consider or decide whether Harrell, the McNairs and the Buchanans are personally obligated under the covenant to appellants, or whether Harrell is personally obligated to the McNairs and the Buchanans, for paving costs under their sale contracts with him. Court costs will be assessed against appellees. The cause is remanded for enforcement of appellants' liens, and for other proceedings consistent with this opinion.

Reversed on both direct and cross-appeals, judgment rendered here for appellants, and cause remanded.

*Roberds, Hall, Lee* and *Holmes, JJ.,* concur.