662 So.2d 1064 (1995)
Karen GOODE and Paul Crimm d/b/a Happy Homes, Inc.
v.
VILLAGE OF WOODGREEN HOMEOWNERS ASSOCIATION.
No. 94-CA-00325-SCT.
Supreme Court of Mississippi.
October 19, 1995.
*1066 James H. Herring, Herring Long & Ward, Canton, for appellants.
Bentley E. Conner, Canton, for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
The Village of Woodgreen Homeowners Association brought suit for injunctive relief against Karen Goode and Paul Crimm. The Association sought a permanent injunction to halt the further construction on Goode's residence until such time as construction proceeded in accordance with the building plans approved by the Architectural Control Committee of the Village of Woodgreen Homeowners Association. On November 17, 1993, a trial was held and Chancellor Ray Montgomery of the Chancery Court of Madison County granted a permanent injunction in favor of the Association. The court on January 7, 1994, entered an order that Crimm and Goode were permanently enjoined from further construction on Goode's residence until they complied with the protective covenants of the subdivision, including the submission and approval of appropriate plans and specifications by the Architectural Control Committee of the Village of Woodgreen Homeowners Association. On April 1, 1994, Goode and Crimm filed their Notice of Appeal to this Court.
The issues on appeal to this Court are as follows:
I. DID THE TRIAL COURT ERR IN RULING THAT IT HAD NO CHOICE BUT TO GRANT THE REQUEST FOR A PERMANENT INJUNCTION TO STOP CONSTRUCTION OF THE GOODE HOME, BECAUSE THE CITY OF MADISON, MISSISSIPPI, HAD ISSUED ITS OWN WORK STOP ORDER HALTING CONSTRUCTION OF THE HOUSE; AND IN RENDERING AN INCOMPLETE OPINION THAT LEFT TO OTHERS THE RIGHT TO JUDICIALLY DETERMINE THE RIGHTS OF THE PARTIES.
II. DO THE PLANS AND SPECIFICATIONS FOR THE HOME BEING BUILT BY THE APPELLANT, KAREN GOODE, AS APPROVED BY THE ARCHITECTURAL CONTROL COMMITTEE, OR THE HOME IN ITS PRESENT STATE OF CONSTRUCTION, VIOLATE THE DECLARATION OF COVENANTS AND RESTRICTIONS OF THE VILLAGE OF WOODGREEN.

III. WERE THE BROAD POWERS GIVEN TO THE ARCHITECTURAL CONTROL COMMITTEE UNENFORCEABLE AS A MATTER *1067 OF LAW, AND WAS THE ARCHITECTURAL CONTROL COMMITTEE ARBITRARY AND UNREASONABLE IN FORCING KAREN GOODE TO HALT CONSTRUCTION OF HER HOME AND IN DEMANDING THAT SHE REBUILD THE ROOF ON HER HOME BEFORE THE HOUSE IS COMPLETED.

IV. WAS KAREN GOODE'S BUILDER, PAUL CRIMM, JUSTIFIED IN ATTEMPTING, DURING THE CONSTRUCTION OF THE GOODE HOME, TO HARMONIZE THE CONFUSING AND INCONSISTENT PLANS AND SPECIFICATIONS THAT WERE APPROVED BY THE ARCHITECTURAL CONTROL COMMITTEE.
V. DID THE TRIAL COURT, IN ARRIVING AT ITS FINAL DECISION IN THE ACTION, ERR IN FAILING TO CONSIDER THE TESTIMONY OF PAUL CRIMM AND OTHERS GIVEN AT THE INITIAL HEARING HELD IN THIS ACTION WHEN THE TRIAL COURT REFUSED TO GRANT TO THE APPELLEE A PRELIMINARY INJUNCTION HALTING THE CONSTRUCTION OF THE GOODE HOME.
VI. WAS THE HOMEOWNERS ASSOCIATION OF THE VILLAGE OF WOODGREEN GUILTY OF LACHES IN FAILING TO TAKE TIMELY ACTION TO ATTEMPT TO PREVENT THE APPELLANT FROM SUBSTANTIALLY COMPLETING CONSTRUCTION OF HER HOME.

STATEMENT OF THE FACTS
On the March 17, 1993, Karen Goode acquired title by special warranty deed to Lot 16, Part 1-A of the Village of Woodgreen Subdivision located within the City of Madison in Madison County, Mississippi. The deed contained language stating that Goode acknowledged and assumed all the obligations described in the protective covenants for the subdivision and that she specifically acknowledged the receipt of a copy of the protective covenants of the subdivision and of the bylaws of the Village of Woodgreen Property Owners Association. Goode also signed the deed acknowledging that she accepted the conditions of the deed and consented to the terms and conditions found in the protective covenants and bylaws of the Property Owners Association. The deed was subsequently filed in the Office of the Chancery Clerk of Madison County on March 31, 1993.
The appellee, the Village of Woodgreen Homeowners Association (hereinafter "Association"), is a nonprofit corporation which was created pursuant to the restrictive covenants adopted by the subdivision developer, Summertree Land Company, Ltd., on October 17, 1980, and recorded in the land records in the office of the Chancery Clerk of Madison County, Mississippi. These covenants have been amended, and the relevant restrictive covenants to this action were filed and recorded in the land records in Madison County on September 2, 1981. Both sets of covenants were referenced in Goode's deed. The amended covenants restated and declared the creation of an Architectural Control Committee ("Committee") and gave the Committee broad powers as shown by the following relevant excerpts:

ARTICLE VI

ARCHITECTURAL CONTROL COMMITTEE
SECTION 1. Review by Committee. No structure, whether a residence, accessory building, tennis court, swimming pool, fences, walls, exterior lighting, or other improvements, shall be constructed or maintained upon any site and no alteration or repainting to the exterior of a structure shall be made and no landscaping performed unless complete plans, specifications, and site plans therefore, showing the exterior design, height, building material and color scheme thereof, the location of the structure plotted horizontally and vertically, the location and size of driveways, the general plan of landscaping, fencing walls and windbreaks and the grading plan *1068 shall have been submitted to and approved in writing by the Architectural Control Committee, and a copy of such plans, specification, and lot plans as finally approved deposited with the Architectural Control Committee... .
SECTION 2. Best Judgement. The Architectural Control Committee shall exercise its best judgment to see that all improvements, construction, landscaping and alterations on lands within the properties conform to and harmonize with existing surroundings and structures.
SECTION 3. Procedures. The Architectural Control Committee shall approve or disapprove all plans and requests within thirty (30) days after submission. In the event the Architectural Control Committee fails to take any action within thirty (30) days after requests have been submitted, approval will not be required, and this Article will be deemed to have been fully complied with and construction shall be in compliance with plans as submitted. The Architectural Control Committee shall adopt procedures and architectural guidelines which shall be approved by the Board of Directors of the Association.
... .
SECTION 5. The Architectural Control Committee shall maintain written records of all applications submitted to it and of all actions it may have taken.
SECTION 6. The Architectural Control Committee shall not be liable in damage to any person submitting requests for approval or to any owner within the properties by reason of any action, failure to act, approval, disapproval or failure to approve or disapprove with regard to such requests. The Architectural Control Committee may refuse approval on any grounds, including purely aesthetic conditions. Any adverse ruling may be appealed to the Committee under its rules and regulations.
... .

ARTICLE VIII

COMMON SCHEME RESTRICTIONS
The following restrictions are imposed as a common scheme upon site and Common Areas for the benefit of each other site and Common Areas and may be enforced by any Owner of site or the Association:
... .
13. All fences, decks, storage buildings, patios, storm doors and screens, sun control devices, swimming pools, garages and carports, driveways or parking pads, additional rooms, porches, greenhouses, air conditioning units, attic ventilators, chimneys and metal flues, dog houses, antennae, flag poles, retaining walls and any other structure or addition to a present structure shall be subject to the approval of the Architectural Control Committee.
The restrictive covenants also provide as follows:

ARTICLE III

THE PROPERTY OWNERS ASSOCIATION
Every person or entity who owns any site, including a builder, shall be a member of the Village of Woodgreen Property Owners Association and shall abide by its Articles of Incorporation and bylaws. Membership shall be appurtenant to and may not be separated from ownership of any site. The Village of Woodgreen Property Owners Association shall be governed by its Articles of Incorporation and bylaws.
Article VI of the restrictive covenants is reiterated verbatim in the bylaws of the Village of Woodgreen Property Owners Association.
On February 21, 1993, approximately one month before she purchased the lot, Goode submitted a set of house plans for approval to the Committee of the Association. This set of plans, dated March 1983, had been previously approved for construction in the Sherlock subdivision in the Village of Woodgreen. Sherlock subdivision is composed entirely of contemporary style homes, while Victoria Square, the subdivision where Goode's house is located, consists of only Victorian styled houses. According to Roger Dennis, property manager for the Association *1069 and chairman of the Committee, this first set of plans was rejected by the Committee, and Goode was asked to get a set of Victorian plans or to have the home redesigned with a steeper roof pitch and higher elevations and to make the house a Victorian style house and resubmit the plans. Also, Dennis testified that at that first meeting, Paul Crimm, Goode's builder and supervisor for the construction of her home, assured the Committee that he would modify the roof line and do other things to change the house to a Victorian style. Doug Thornton, architectural consultant for the Committee, testified that the first set of plans was rejected by the Committee because the elevation of the house had to be increased to fit the architectural scheme of Victoria Square and the foundation was inadequate to give the house stability. Minutes of the February 21, 1993, meeting indicate that Goode was asked to have the elevations redrawn to a Victorian style and also to have the foundation redrawn to provide stronger support for the house. Goode indicated that she was only asked to incorporate a new foundation plan.
Goode had the plans redrawn and had Wayne Caldwell, her uncle and a civil engineer, redraw the foundation. At a Committee meeting held on March 30, 1993, Goode submitted the new set of plans redrawn as the first three sheets attached on top of the old plan. The new plans included the foundation sketch dated March 30, 1993, and stapled onto page 1, and new elevations demonstrating a steeper 10 to 12 roof pitch on the roof line of the garage and of the main part of the house, instead of the 8 to 12 roof pitch that was drawn on the original set of plans. Pages 1 through 3 of Goode's plan submitted on this occasion were dated March 15, 1993, while the remaining pages (4 through 11) of that plan were dated August 1983. Goode testified that she did not notice the roof pitch changes on the newer plans which she had redrawn. On March 30, 1993, the Committee approved Goode's building plan which had three pages dated March 15, 1993, attached on the front of the old plan. Minutes of the meeting held on March 30, 1993, verified that the elevations had been redrawn to Victorian style and that the foundation was now adequate. Dennis testified that there could be no confusion as to which plans were approved because Goode and Crimm were the ones who attached the new plan to the old plan. On March 31, 1993, Crimm applied to the City of Madison, Mississippi for a building permit for construction of Goode's house. Crimm subsequently submitted the plan approved by the Committee to Madison. The plan was approved by Madison, and a building permit was issued by Madison on or around April 2, 1993.
Construction on Goode's house began during the first part of April 1993. Although the exact date was not known, Dennis testified that framing began on Goode's house on a Monday and was essentially completed by Saturday of the same week. During the weekend that framing was completed, two residents of Victoria Square and one member of the Committee contacted Dennis and told him that Goode's house had the wrong roof on it. Dennis went to the house the following Monday morning where he saw a crew working on the roof. He then located Crimm at the site of another house and told Crimm that the roof pitch on Goode's house was wrong and would have to be changed. At that point, Dennis indicated that only the decking was on the roof and that when he saw the house again on Wednesday, shingles were on the roof and it was basically complete. Goode testified that the roof, including shingles, was completed on May 22, 1993.
On the day that Dennis confronted Crimm about the roof, Dennis told Crimm that Crimm needed to come to a meeting that afternoon with the Association. The meeting was held on June 1, 1993, according to Goode. Crimm informed Goode and both of them went to the meeting that afternoon where Crimm stated that he had already finished the roof and could not change the pitch and would refrain from building for a week or two weeks. During the meeting, Goode was told that the roof was not high enough and should be corrected.
On June 14, 1993, Goode, accompanied by her house designer, went to another meeting with the Committee. Crimm testified that at this meeting, Goode had her designer make some sketches of what could be done to the *1070 house to bring it into harmony with the other houses in Victoria Square and that the architect on the Committee stated that he would recommend acceptance if all of the proposed changes were made. Minutes from the meeting indicate that Goode proposed changes to bring the house up to acceptable standards and was asked to produce to scale drawings for future consideration. Following that meeting, Crimm testified that Goode told him about what was proposed at the meeting and the reaction of the Committee, to which Crimm replied, "Okay, we'll go ahead and finish it then." Crimm continued building.
On June 21, 1993, Goode met once again with the Committee to submit her proposed changes to the plan. Minutes from that meeting indicate that the Committee reviewed the changes that were proposed to correct the builder's mistakes, and the changes were not approved. Yet, Crimm continued to build the house.
On July 2, 1993, Dennis wrote a letter to the city of Madison indicating the discrepancy between the house as built and the plans approved. The next day, July 3, 1993, a stop work order was issued by the Director of the Department of Public Works to Happy Homes, Inc. (owned by the builder, Crimm) directing that Crimm cease construction of Goode's house in order to give the city authorities time to evaluate the house and its deviation from the approved plans.
On July 16, 1993, the Association filed suit against Goode and Crimm, d/b/a Happy Homes, Inc., in the Chancery Court of Madison County, Mississippi, seeking a temporary restraining order to prevent further construction on the house. On July 22, 1993, the Association filed suit against the appellants seeking a preliminary injunction and a permanent injunction to enjoin the appellants from continuing the construction of the house until they comply with the plans as approved by the Committee. The hearing on the request for a preliminary injunction was held on July 26, 1993. After hearing testimony, the trial court denied the request for a temporary restraining order.
Crimm and Goode contested the stop work order before the Mayor and Board of Aldermen for the City of Madison. After investigation and inspection of the house by the City, the stop work order was confirmed and ratified by that order dated August 11, 1993. The Mayor and Board of Aldermen for the City of Madison found that the house as constructed substantially deviated from the plans approved by the City and that the stop work order should remain in effect until the house is brought into compliance with the approved plans, "specifically including but not limited to a 10:12 roof pitch." Goode appealed the decision of Madison concerning the stop work order to the Circuit Court of Madison County, Mississippi. By agreement of the parties, that action has been abated until this Court renders its decision in the present case.
On November 17, 1993, a hearing regarding the permanent injunction was held, and after hearing testimony in this action, the trial court granted a permanent injunction. The permanent injunction prevented Goode and Crimm from conducting any further construction on Lot 16 until they complied with the protective covenants of the subdivision, including getting the approval of the Committee on plans submitted to correct the builder's mistakes.

DISCUSSION OF THE LAW

I. DID THE TRIAL COURT ERR IN RULING THAT IT HAD NO CHOICE BUT TO GRANT THE REQUEST FOR A PERMANENT INJUNCTION TO STOP CONSTRUCTION OF THE GOODE HOME, BECAUSE THE CITY OF MADISON, MISSISSIPPI, HAD ISSUED ITS OWN WORK STOP ORDER HALTING CONSTRUCTION OF THE HOUSE, AND IN RENDERING AN INCOMPLETE OPINION THAT LEFT TO OTHERS THE RIGHT TO JUDICIALLY DETERMINE THE RIGHTS OF THE PARTIES?

Standard of Review
This Court will not disturb findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or applied *1071 an erroneous legal standard. Tinnin v. First United Bank of Miss., 570 So.2d 1193, 1194 (Miss. 1990). Where there is substantial evidence to support the chancellor's findings, this Court is without the authority to disturb his conclusions, although this Court might have found otherwise as an original matter. In re Estate of Harris, 539 So.2d 1040, 1043 (Miss. 1989). In addition, where the Chancellor has made no specific findings, this Court will proceed on the assumption that he resolved all such fact issues in favor of the appellee. Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990); PMZ Oil Co. v. Lucroy, 449 So.2d 201, 205 (Miss. 1984).

Analysis
The appellant argues that the trial court conceded jurisdiction of this case to an unrelated action by the City of Madison. In supporting its argument that the trial court based its decisions on the binding effect of the stop work order issued by Madison, the appellant references statements made by the chancellor during his ruling which denied the appellant's motion to dismiss the petition for a permanent injunction and in his bench opinion granting a permanent injunction. Specifically, the appellant charges that the chancellor, in his ruling denying the appellant's motion to dismiss the petition for a permanent injunction, "clearly stated that it had no choice but to uphold the Stop Work order halting construction of the Goode home which had been issued by the city of Madison" and that the "[t]rial court later restated its conclusion that it was bound by the Stop Work Order when it rendered its final decision granting the Permanent Injunction."
The entire ruling by the chancellor denying the appellants' motion to dismiss the petition for a permanent injunction is set out as follows:
Well, based on argument of counsel, this Court is going to overrule the Motion to Dismiss based primarily on the testimony of the Defendant, who testified that she was a licensed real estate agent and/or broker in the State of Mississippi, and she knew or should have known the significance of covenants in the construction of homes when covenants exist in a subdivision.
However, the Court has taken further into consideration the testimony of Mr. Mayfield of the Homeowners Association that approved the plans tendered to this Court as Exhibit P-1, and I quite frankly don't see how anybody could construct a house based on those plans, and the inconsistencies therein.
So, I fault both the Homeowners Association and the Defendant in constructing a house to which she has testified does not in its present stage of construction follow the plans as submitted in Exhibit P-1, to which she has admitted and testified to. It's regrettable that we have to be here in court on a matter such as this, but the time element of building something and tearing it down is extremely costly; however, this Court through earlier testimony it indicated that the parties to this proceeding, being the Woodgreen property owners or the Homeowners Association against the Defendant and her builder does not have any control whatsoever over the case of the appeal of the stop order issued by the City of Madison, to which this Court has no jurisdiction in this regard.
So, in overruling the Motion to Dismiss the injunction as a practical consideration is of no force and effect as long as the stop order issued by the City of Madison is in existence and is in litigation.
So, I don't know what could be accomplished by any further consideration in the injunction until after the Circuit Court rules on the appeal, the administrative appeal, from the Board of Alderman of the City of Madison as it relates to the stop order.
So, with those comments, again, the Court is going to overrule the Motion to Dismiss this Complaint for Permanent Injunction.
The appellants' statement that the "[c]ourt clearly stated that it had no choice but to uphold the Stop Work Order" is located nowhere within the ruling. Nowhere in the ruling does the trial court concede jurisdiction of this case to the city of Madison in any way. In fact, the trial court in its ruling stated that the parties to the present case *1072 have no control over the appeal of the stop order issued by the city of Madison and that the trial court in the present case had no jurisdiction over the appeal of the stop work order. Further, the chancellor in his ruling stated that the circuit court would rule on the appeal of the stop work order issued by the city of Madison.
In his ruling on the motion to dismiss, the chancellor did state that his overruling of the motion to dismiss the petition for a permanent injunction, as a practical matter, had no force and effect as long as the stop order issued by Madison was in existence. Taken in its context, this statement merely referred to the fact that the appellants' ability to continue building would still be barred by the stop order even if the motion to dismiss was sustained.
Appellants' argument that the trial court's decision to grant the permanent injunction was based on the binding effect of the stop work order is also without support. The appellants construe part of the chancellor's bench opinion granting a permanent injunction as indicating that only the city of Madison had the authority to stop construction of Goode's house. The relevant portion of the chancellor's bench opinion is set out as follows:
But, there's been no showing that the homeowners association have any say so [sic], whatsoever, as to stopping someone, even the testimony of Mr. Dennis, the property manager, said that he doesn't inspect to make sure that the plans are being complied with. This apparently is some other person, maybe from a municipality that did not testify today. And, apparently there is since Counsel has announced to the Court through the testimony of the Defendant that there is an appeal of the August 11th, Board of Alderman meeting in the City of Madison to the Circuit Court of Madison County to be determined. So, apparently, from the testimony and evidence before this court that the only person that's got any right or authority to stop the construction anywhere within the municipality of the City of Madison would be the City of Madison authorities and not the homeowners association, or a court of competent jurisdiction.
In the bench opinion, the chancellor referred to the fact that the homeowners association did not have the authority on its own to stop construction of Goode's house, but that only the "[c]ity of Madison authorities" or a "court of competent jurisdiction" had that authority. To interpret this statement as an affirmation that the chancellor was basing his opinion to grant the injunction on the stop work order is ludicrous. The chancellor, in the first sentence of his bench opinion, stated that, "based upon the testimony and the evidence and the admission of the defendant, Karen Goode, ... the plans submitted and approved were not followed." Furthermore, the chancellor signed an Order which granted a permanent injunction and which contained a statement that the chancery court had jurisdiction over the parties and subject matter of the suit. Nothing in the chancellor's opinion demonstrates that he abdicated his authority to the city of Madison or to the circuit court wherein the action concerning the stop work order was pending.
Appellants also argue that the chancellor's decision in this case should be reversed because it is incomplete and ambiguous as to its meaning. This Court has held that a chancery court decree must be reasonably certain in its terms. William W. Bond, Jr. & Associates, Inc. v. Lake O'The Hills Maintenance Ass'n, 381 So.2d 1043, 1046 (Miss. 1980); Norris v. Norris, 157 Miss. 457, 459, 128 So. 342, 342 (1930). In Lake O'The Hills, this Court cited Justice Griffith's statements in Mississippi Chancery Practice that:
A reasonable certainty and a fair precision are elemental requirements entering into all the important parts of judicial procedure, and obviously the requirement is equally obligatory as to decrees. There must in all respects be a clear and unambiguous certainty in all the provisions of a decree so that every party thereto may know exactly what he is to do in obedience to it and that all may safely perform its terms as written; and particularly must this be true when the decree is framed to meet the exigencies of a complicated situation *1073 wherein misunderstanding might easily arise. It should be complete within itself,  containing no extraneous references, and leaving open no matter or description or designation out of which contention may arise as to the meaning. Nor should a final decree leave open any judicial question to be determined by others, whether those others be the parties or be the officers charged with the execution of the decree, and even as to matters solely affecting the execution, if their nature be such as is likely to eventuate in dispute, reservation for further directions should be made if impossible safely to do otherwise. (§ 625 at 714).
Lake O'The Hills, 381 So.2d at 1045.
To support the argument that the chancellor's opinion in this case was uncertain in its terms, the appellants point to language in the chancellor's bench opinion granting the permanent injunction, which language is set out as follows:
So, having said that, I see no alternative for this Court but to grant the injunction prayed for. However, there has been no further showing to this Court as to what it would take to comply with the arbitrary discretion of the Woodgreen Homeowners Association to bring this house into compliance, other than changing an 8-12 pitch to a 10-12 pitch roof on a carport. Maybe there is a middle ground, or maybe the Woodgreen Homeowners Association could approve a drawing such as that prepared by Mr. Jack Hughes as alluded to by the Plaintiff in her testimony to offset the apparent "Victorian-style" home by changing the pitch of the roof. I would probably never notice it. Counsel would probably never notice it, but only some builder would probably notice it. A home is an investment [] probably the largest any individual ever makes in their lifetime. And, so, protective covenants are designed to protect their investment.
But, I would suggest, in granting the injunction, that the parties reach some kind of an agreement. And, it's disturbing to the Court that we're here today because plans were adjusted and amended to meet the requirements of the homeowners association only were not followed. The contractor/builder did not testify. But, the Defendant, homeowner, testified that the house built is not the house on the plans submitted and approved by the Homeowners Association.
So, that will be the order of the Court granting the injunction.
The appellants contend that the chancellor suggested that the parties get together and seek a middle ground, and that the court essentially placed the action on hold until some agreement could be reached. However, the chancellor clearly determined that the appellants failed to follow the plans that had been approved by the Committee, that according to the defendant, the house built is not the house on the plans submitted and approved by the Association, and that Goode and Crimm were permanently enjoined from further construction on Lot 16 until they complied with the protective covenants for the subdivision, "including the submission and approval of appropriate plans and specifications by the Architectural Review Committee of the Village of Woodgreen Homeowners Association." The chancellor's decision was reasonably certain in its terms and left no room for any other interpretation; the appellants had to comply with the protective covenants for the subdivision for the permanent injunction to be lifted. To comply with article VI of the covenants, the appellants had to get approval of their building plans from the Committee and then build in accordance with those approved plans. While the chancellor did state that there might be a middle ground, it is this Court's opinion that this statement referred to the possibility that perhaps the appellants could work with the Association on getting plans approved that would not call for the reconstruction of the entire roof. The possibility that the appellants might negotiate with the Committee to get approved a particular plan that would bring the house into conformity with other Victorian-styled houses in no way confuses the chancellor's opinion that the appellants must comply with the protective covenants.

II. DO THE PLANS AND SPECIFICATIONS FOR THE HOME BEING BUILT BY THE APPELLANT, *1074 KAREN GOODE, AS APPROVED BY THE ARCHITECTURAL CONTROL COMMITTEE, OR THE HOME IN ITS PRESENT STATE OF CONSTRUCTION, VIOLATE THE DECLARATION OF COVENANTS AND RESTRICTIONS OF THE VILLAGE OF WOODGREEN?

Appellants argue that the home as built does not violate the covenants of the subdivision because the covenants place no limitation on architectural design, floor space, or roof line of a home built in the Village of Woodgreen.
The law in Mississippi favors the free and unobstructed use of real property. City of Gulfport v. Wilson, 603 So.2d 295, 299 (Miss. 1992); Kinchen v. Layton, 457 So.2d 343, 345 (Miss. 1984). "[Restrictive] covenants are subject more or less to a strict construction and in the case of ambiguity, construction is most strongly against the person seeking the restriction and in favor of the person being restricted." Kemp v. Lake Serene Property Owners Ass'n, Inc., 256 So.2d 924, 926 (Miss. 1971).
An important corollary rule, however, is that the clear and unambiguous wording of protective covenants will not be disregarded merely because a use is prohibited or restricted. If the intent to prohibit or restrict be expressed in clear and unambiguous wording, enforcement is available in the courts of this state.
Andrews v. Lake Serene Property Owners Ass'n, 434 So.2d 1328, 1331 (Miss. 1983).
The applicable provision of the restrictive covenants for the Village of Woodgreen provides that, "[n]o structure ... shall be constructed ... unless complete plans, specifications, and site plans therefore, showing the exterior design, height, building material and color scheme thereof ... shall have been submitted to and approved in writing by the Architectural Control Committee... ." Construing this restrictive covenant in its "ordinary sense" and according to its "apparent purpose," Mendrop v. Harrell, 233 Miss. 679, 688, 103 So.2d 418, 422 (1958), the covenant clearly and plainly states that before a house can be constructed in the subdivision, the Committee must approve of the building plans. To state that this covenant places no limitation on the construction and architectural design of a house is simply an erroneous statement. The appellants also had notice of this covenant. Goode's deed contained language stating that she acknowledged and assumed all of the obligations described in the protective covenants for the subdivision and that she specifically acknowledged the receipt of a copy of the protective covenants of the subdivision and of the bylaws of the Association. Goode also signed the deed acknowledging that she accepted the conditions of the deed and consented to the terms and conditions found in the protective covenants and bylaws of the Association. Furthermore, both Crimm and Goode testified that they knew that the Committee had to approve any building plans prior to construction in the subdivision.
Based on the testimony, the evidence and the admission of Goode, the chancellor found that the building plans that were submitted and approved were not followed. The appellants' actions in not building in accordance with the building plans that were approved runs afoul of the plain language found in the restrictive covenant.

III. WERE THE BROAD POWERS GIVEN TO THE ARCHITECTURAL CONTROL COMMITTEE UNENFORCEABLE AS A MATTER OF LAW; AND WAS THE ARCHITECTURAL CONTROL COMMITTEE ARBITRARY AND UNREASONABLE IN FORCING KAREN GOODE TO HALT CONSTRUCTION OF HER HOME AND IN DEMANDING THAT SHE REBUILD THE ROOF ON HER HOME BEFORE THE HOUSE IS COMPLETED?
Appellants contend that the broad powers given to the Committee through the restrictive covenants are unenforceable as a matter of law. The Committee is appointed by the board of directors of the Association, and as such, the Committee is an extension of the Association. This Court has addressed the powers of a homeowner association. Perry v. Bridgetown Community *1075 Ass'n, Inc., 486 So.2d 1230 (Miss. 1986); See also Kemp, 256 So.2d at 925-26 (restrictive covenant requiring plans for construction to be approved by the building committee of the homeowner's association was not violated where the completed building conformed to the plans that were approved). One such power is the power to control the use and enjoyment of the property. Perry, 486 So.2d at 1233. "The extent of the power is defined in the declaration [of covenants], but usually encompasses use and size of buildings upon individual lots and regulation of the property commonly enjoyed by all lot owners." Id. at 1233. As to the limits of this power, this Court has stated that:
the association is not beyond review in administration of these powers... . Review by the court must be guided by the intent stated in the declaration of purpose and judged by a test of reasonableness. Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180 (Fla.App. 1975). Applying a reasonableness standard to a regulation, this Court will consider not only the rights of the individual owner, but also the rights of the other association members who expect maintenance in keeping with the general plan of development for the subdivision.
Id. at 1234. No Mississippi case has ever declared as unenforceable a covenant which requires builders to get approval of their plans from a homeowners association before they can begin construction in a subdivision to which the covenants apply.
Applying a reasonableness standard to the restrictive covenants, powers granted the Association through the restrictive covenants are enforceable and were reasonably applied in requiring Goode to build in compliance with the plans as approved by the Committee. The apparent intent of the restrictive covenants was to "preserve the values and amenities" of the Village of Woodgreen community for the "benefit of said property and each owner thereof." Considering "the rights of the other association members who expect maintenance in keeping with the general plan of development for the subdivision," to allow Goode to deviate from her approved plans would unfairly and unjustly make ineffective the restrictive covenants in reliance upon which the remaining homeowners have made a lifelong investment. Perry, 486 So.2d at 1234. In light of the testimony and evidence which shows that Goode had notice of the architectural design required in Victoria Square before Goode purchased the lot, and considering the fact that Goode submitted both the original plans which were rejected and the amended plans which were approved, it follows that the Committee's requirement that Goode build in accordance with the approved plan showing the 10 to 12 pitch roof is not unreasonable.

IV. WAS KAREN GOODE'S BUILDER, PAUL CRIMM, JUSTIFIED IN ATTEMPTING, DURING THE CONSTRUCTION OF THE GOODE HOME, TO HARMONIZE THE CONFUSING AND INCONSISTENT PLANS AND SPECIFICATIONS THAT WERE APPROVED BY THE ARCHITECTURAL CONTROL COMMITTEE?
Appellants contend that Crimm was confronted with inconsistent house plans that he attempted to harmonize in order to build a house that was Victorian in appearance. Crimm's "harmonizing" of the plans amounted to nothing more than the appellants' refusal to build the house in accordance with the plans that they submitted and that the Committee approved. At a hearing on July 26, 1993, for a preliminary injunction, Crimm testified that he noticed that the roof pitch had been changed from 8 to 12 to 10 to 12 on page 1 of the approved plan, that he knew that differences existed between the old section of the plan and the new section of the plan, that he had to build according to what the owner likes, also, and that maybe he should have contacted Dennis regarding changes desired by Goode in the house plan. In addition, Dennis testified that Crimm, at the first Committee meeting on February 21, 1993, assured the Committee that he would modify the roof line and otherwise change the house to a Victorian style. When the Committee approved the plan calling for a 10 to 12 roof pitch and Crimm was aware of the required change, there was nothing inconsistent *1076 about the roof for Crimm to "harmonize."

V. DID THE TRIAL COURT, IN ARRIVING AT ITS FINAL DECISION IN THE ACTION, ERR IN FAILING TO CONSIDER THE TESTIMONY OF PAUL CRIMM AND OTHERS GIVEN AT THE INITIAL HEARING HELD IN THIS ACTION WHEN THE TRIAL COURT REFUSED TO GRANT TO THE APPELLEE A PRELIMINARY INJUNCTION HALTING THE CONSTRUCTION OF THE GOODE HOME?
In his bench opinion granting the permanent injunction, the chancellor stated:
Further, the Court regrets that the Defendant builder, Mr. Crimm, did not present testimony. So, we cannot even consider that other than he being a defendant and Mr. Dennis testifying on rebuttal about notifying the builder of the apparent problem of the pitch of the roof over the garage, and nothing transpiring as a result of that confrontation before this Court to consider today.
Appellants argue that the chancellor committed reversible error when he failed to consider the testimony given at the hearing for a preliminary injunction by Crimm. At a hearing held on July 26, 1993, for a preliminary injunction, Crimm testified that he was aware that the Committee had to approve plans before a house could be built in the subdivision and that he noticed the different roof pitches in the old section of the plan and the new section of the plan. Crimm also testified that he stopped construction on the house after Dennis informed him of the roof problem and continued with construction when Goode told him what was said at a Committee meeting. In addition, Goode admitted that maybe he should have contacted Dennis regarding changes that Goode desired in the house plan, but that he tried to just use a little common sense concerning the construction.
Appellants contend that the testimony given by Crimm at the hearing for a preliminary injunction should have been considered by the trial court in rendering its decision on whether to grant a permanent injunction based on Mississippi Rule of Civil Procedure 65 and its Comments, which states in part as follows:
Under Rule 65(a)(2) the court can consolidate the hearing on the preliminary injunction with the trial of the action on the merits; in the event consolidation is not ordered, the record upon the hearing of the motion for preliminary injunction becomes a part of the record at the trial on the merits.
M.R.C.P. 65, Comment. However, the chancellor's error, if any, was harmless because nothing prevented Crimm from testifying at the hearing for a permanent injunction, Crimm's testimony contained some information adverse to his case, and the chancellor based his decision to grant a permanent injunction, in part, on the admission of Goode that the plans submitted and approved were not followed. Therefore, the chancellor committed no reversible error in failing to consider Crimm's testimony presented at the hearing for a preliminary injunction when the chancellor made his decision to grant a permanent injunction.

VI. WAS THE HOMEOWNERS ASSOCIATION OF THE VILLAGE OF WOODGREEN GUILTY OF LACHES IN FAILING TO TAKE TIMELY ACTION TO ATTEMPT TO PREVENT THE APPELLANT FROM SUBSTANTIALLY COMPLETING CONSTRUCTION OF HER HOME?
Appellants raise, for the first time on appeal, the affirmative defense of laches. However, this Court has held that it need not address issues raised for the first time on appeal. R & S Development, Inc. v. Wilson, 534 So.2d 1008, 1012 (Miss. 1988). Furthermore, Rule 8(c) of the Mississippi Rules of Civil Procedure provides that:
Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively ... laches ... and any other matter constituting an avoidance or affirmative defense.
M.R.C.P. 8(c). For a party to rely on an affirmative defense, the party must affirmatively *1077 plead the defense. Wholey v. Cal-Maine Foods, Inc., 530 So.2d 136, 138 (Miss. 1988). Affirmative defenses that are neither pled nor tried by consent are deemed waived. Id. "Affirmatively pleading the defense of laches ordinarily calls for a full hearing of testimony of both sides." Allen v. Mayer, 587 So.2d 255, 260 (Miss. 1991). In the present case, the appellants failed to affirmatively plead the defense of laches and also failed to raise the defense at any time during the hearings. Therefore, appellants are procedurally barred from raising the defense of laches for the first time on appeal.

CONCLUSION
Based upon the evidence and testimony presented, it does not appear that the chancellor was manifestly wrong in granting a permanent injunction against the appellants to enjoin them from further construction on the house until they comply with the restrictive covenants of the subdivision.
The chancellor based his opinion upon testimony and other evidence and the admission of Goode that the plans submitted and approved were not followed. In rendering his decision, the chancellor's opinion was reasonably certain in its terms and left no room for any other interpretation; the appellants had to comply with the protective covenants for the subdivision for the permanent injunction to be lifted.
The restrictive covenants clearly and plainly state that before a house can be constructed in the subdivision, the Committee must approve of the building plans. The appellants' actions in not building in accordance with the building plans that were approved runs afoul of the plain language found in the restrictive covenants.
No Mississippi case has ever declared as unenforceable a covenant which requires builders to get approval of their plans from a homeowners association before the builder can begin construction in a subdivision to which the covenants apply. Furthermore, in light of the testimony and evidence which shows that Goode had notice of the architectural design required in Victoria Square before Goode purchased the lot, and especially considering the fact that Goode submitted both the original plans which were rejected and the amended plans which were approved, the Committee's requirement that Goode build in accordance with the approved plan showing the 10 to 12 pitch roof is reasonable. Goode should not be able to hide behind alleged inconsistencies in the plans when she was the person who submitted all versions of the building plans and caused the inconsistencies of which she now complains.
Crimm's "harmonizing" of the plans amounted to nothing more than the appellants' refusal to build the house in accordance with the plans that they submitted and that the Committee approved.
Finally, appellants are procedurally barred from raising the affirmative defense of laches for the first time on appeal, especially in light of the fact that appellants failed to plead the defense or raise the defense at any time during the hearings. Therefore, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.